UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                                        :
NYRADAWN E. WEATHERBY                                   :     3:17 CV 1522 (RMS)
                                                        :
V.                                                      :
                                                        :
NANCY A. BERRYHILL,                                     :
ACTING COMMISSIONER OF                                  :
SOCIAL SECURITY[1]                                      :     DATE: SEPT. 21, 2018
                                                        :
------------------------------------------------------- x

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff Disability Insurance benefits ["DIB"].

I.     ADMINISTRATIVE PROCEEDINGS

On or about August 13, 2013, the plaintiff filed an application for DIB claiming she has been disabled since October 25, 2011, due to a history of a traumatic brain injury, migraines, back and neck pain, mental disorders, affective disorder, obesity, asthma, memory loss, learning disorder, and a history of right shoulder surgery. (Certified Transcript of Administrative Proceedings, dated November 3, 2017 ["Tr."] 152, 374-75).[2] The plaintiff's application was

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

[2] The plaintiff had an earlier application for DIB, dated December 17, 2009 (Tr. 366-69; *see generally* Tr. 92-123, 175-240), and on October 24, 2011, the plaintiff was denied benefits (Tr. 124-25); the Appeals Council affirmed that decision on May 1, 2013. (Tr. 146-50).

denied initially (Tr. 243-46; *see* Tr. 151-63) and upon reconsideration. (Tr. 248-50; *see* Tr. 164-73, 247). On September 25, 2014, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 251-53; *see* Tr. 254-75, 280-305, 309-14), and after the plaintiff requested a continuance to secure counsel (*see* Tr. 315-22),[3] a hearing was held on January 13, 2016 before ALJ Louis Bonsangue, at which the plaintiff testified, and vocational expert testimony was taken by phone. (Tr. 41-91; *see* Tr. 323-59). On April 29, 2016, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 19-40). On July 26, 2017, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On September 8, 2017, the plaintiff filed her complaint in this pending action (Doc. No. 1), and on November 20, 2017, the defendant filed her answer and administrative transcript, dated November 3, 2017. (Doc. No. 13). On February 9, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge; the case was transferred to Magistrate Judge Joan G. Margolis. (Doc. No. 17). On March 15, 2018, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 21), with Stipulated Facts and a brief in support (Doc. No. 21-1 ["Pl.'s Mem."]). On May 1, 2018, this case was transferred to this United States Magistrate Judge (Doc. No. 22), and on May 10, 2018, the defendant filed her Motion to Affirm (Doc. No. 23), and brief in support (Doc. No. 23-1 ["Def.'s Mem."]). On May 23, 2018, the plaintiff filed a reply brief. (Doc. No. 24).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 21) is *granted such that the case is remanded for further proceedings consistent with this Ruling*, and the defendant's Motion to Affirm (Doc. No. 23) is *denied*.

---

[3] With the exception of this brief period, the plaintiff has been represented by counsel throughout the administrative proceedings underlying this appeal, and on this appeal. (*See* Tr. 240-42, 315-22; *see also* Tr. 175-76, 238-39).

II.     FACTUAL BACKGROUND

On the date of her hearing, the plaintiff was 40 years old (Tr. 46; *see* Tr. 92) and living alone in a one-level house with her cat. (Tr. 51-52, 440). She reported that she requires help with all household chores (Tr. 442), and she spends her days watching television or reading. (Tr. 443). She has a high school degree, one year of college, and a cosmetology certificate. (Tr. 52, 429).

At the hearing, the plaintiff wore dark sunglasses to block the light as she suffers from photosensitivity due to her migraine headaches. (Tr. 50). She drives, but she testified that her migraines limit her driving. (Tr. 52). According to the plaintiff, she has "a constant daily headache that has, in the last four years, continued to get worse[.]" (Tr. 58). The pain "used to be at a two or three[]" on a pain scale to ten and now it is "constant all the time[]" at a "five or six on a—just a regular, daily basis." (Tr. 58). When a headache "flares up" to a migraine, she takes her medicine and goes to bed in the dark, with heavy black plastic over her bedroom window because she cannot handle any light. (Tr. 59). She experiences nausea, vomiting, dizziness and balance problems. (Tr. 60). The migraines last at least a day, if not two or three, and she gets them four to five days a week. (Tr. 60 ("[I]t's sometimes hard to tell where the migraine—where one migraine started and where the next—where it stopped and the next one began.")).

The plaintiff also testified that she has neck pain as a result of a car accident in which she fractured her third vertebrae in her neck; her movement is restricted, and the "neck is part of what causes the migraines." (Tr. 61). She takes Cloracepital, a muscle relaxant, for her neck. (Tr. 62). She also has low back pain that "shoots pain down both [of her] legs and it makes [her] legs stop working[,]" sometimes "[causing her to] fall[]." (Tr. 63). She had shoulder surgery and since then her shoulder has been "[m]ostly fine." (Tr. 63). She does home therapy. (Tr. 64).

She has depression and anxiety as a result of her migraines; she spends a large portion of time in a dark room, "hurting so bad[.]" (Tr. 64). At the time of the hearing, she weighed over 260 pounds. (Tr. 73-74). She talks to a therapist two to three times a week, which she said helps, and she sees her dad and stepmom and a couple of friends on a sporadic basis. (Tr. 65-66). When she cannot drive, she has appointments with her therapist on Skype. (Tr. 71). She microwaves food, and she usually has help going to the grocery store. (Tr. 67). She does not keep her house clean, and she rarely does laundry. (Tr. 67). She cannot shower every day, and sometimes she cannot lift her leg up over the bathtub due to her back pain. (Tr. 68).

The plaintiff's depression and anxiety affect her sleep; she takes Ambien which helps her sleep five to seven hours at a time. (Tr. 71-72). Some weeks she does not leave her house, but on a "good week[,]" she goes out about twice in the week. (Tr. 72). On a relatively good day, she may try to do a chore, she quilts, and she watches television and reads, but has trouble remembering what she read or saw. (Tr. 72-73). She compensates for her memory problems by trying to do the same things all the time, like leaving her keys in a designated spot. (Tr. 73). When she uses the stove, she stands in front of it for the entire time; otherwise, she will forget the stove is on. (Tr. 73).

She worked as a hairdresser and then for her father as a bookkeeper and office manager, and, near the end of her employment, as a part-time file clerk.[4] (Tr. 54-57, 69, 409, 425, 454-58). She has not worked at all since July 31, 2009 (Tr. 424, *see* Tr. 380, 383, 385, 389, 402, 406), although she reports that she became unable to work because of her impairments as of June 1, 2008. (Tr. 424). She testified that when she worked for her father's law firm, she paid bills and balanced the checkbook, managed the office, interviewed potential employees, conducted some

---

[4]The ALJ denied a request at the hearing for the plaintiff's father to testify. (Tr. 74).

4

training, wrote office procedures, and did the bookkeeping. (Tr. 54-55). Accommodations were made for the plaintiff, first in terms of her work schedule and then her responsibilities, as she was moved from her position of office manager to her job as file clerk. (Tr. 47). According to the plaintiff, she "could no longer do [her] job as hired. [She] could not sit, stand or move without pain." (Tr. 424). Additionally, although she had been the one to write the office procedures for the law office, she could no longer focus long enough to do those tasks. (Tr. 88-89). By the time she left her job at the law firm, the plaintiff could not keep up with the work, could not drive there, and could not function due to her migraine headaches and her back pain. (Tr. 69-70).

The vocational expert testified that the claimant's past relevant work was as an office manager, bookkeeper, and file clerk. (Tr. 82-83). He testified that, under the ALJ's first hypothetical of an individual limited to light exertional level work, who could only perform simple, routine and repetitive tasks, but not at a production-rate pace, such individual could not perform the plaintiff's past relevant work, but could perform the work of a marker, a photocopying machine operator, and an assembler of plastic hospital products. (Tr. 83-84).

In the next hypothetical of an individual limited to sedentary work, with a sit/stand option, no climbing of ropes, ladders or scaffolds, limited to simple, routine repetitive tasks, not at a production-rate pace, the vocational expert testified that the plaintiff's past relevant work was not available, but such an individual could perform the work of a call-out operator, document preparer, and surveillance system monitor. (Tr. 84-86).

In the third hypothetical, the ALJ identified the same limitations as those in the second and added that the individual would have to take several unscheduled breaks during the day, from one half hour to four hours, sometimes even leaving work to go home and rest or go into a dark room. (Tr. 86). The vocational expert testified that, under such a scenario, no jobs were available. (Tr.

86). Additionally, if the individual would be off task 15% or more of the work day, there would be no jobs such an individual could perform, nor would there be jobs for an individual who would miss two or more days of work per month. (Tr. 87-88). Similarly, if an individual had to take a break to lie down during the day, it would not be tolerated if the time exceeded the normal work breaks. (Tr. 88).

III.   STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings

are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

IV.  DISCUSSION

    A.  THE ALJ'S DECISION

Following the five step evaluation process,[5] the ALJ found that the plaintiff's date last insured under the Social Security Act was September 30, 3014 (Tr. 24) and that she has not engaged in substantial gainful activity from her alleged onset date of October 25, 2011 through her date last insured. (Tr. 24-25, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that the plaintiff has the following severe impairments: degenerative disc disease, obesity, affective disorder, organic brain disorder, and migraine headaches (Tr. 23, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 25-27, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ found that, through the plaintiff's date last insured, the plaintiff had the residual functional capacity ["RFC"] to

---

[5] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), "except she is capable of simple, routine, and repetitive tasks, but not at a production-rate pace"; she "can never climb ramps, stairs, ropes, ladders, or scaffolds"; and she would "need a sit/stand option." (Tr. 27-33). The ALJ then concluded that the plaintiff, through her date last insured, was unable to perform any past relevant work and would continue to be unable to perform her past relevant work (Tr. 33, citing 20 C.F.R. § 404.1565), but retained the RFC to perform work that exists in significant numbers in the national economy, including the work of a call out operator, document preparer, and surveillance system monitor. (Tr. 34-35, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Accordingly, the ALJ concluded that the plaintiff was not disabled through September 30, 2014, her date last insured. (Tr. 35).

B.     THE PLAINTIFF'S CLAIMS

The plaintiff contends that the ALJ erred in his evaluation of her migraines. (Pl.'s Mem. at 23-24; *see* Pl.'s Reply at 1-4). Additionally, the plaintiff argues that the ALJ erred in the weight he assigned to the treating physicians' opinions (Pl.'s Mem. at 16-20) in that (1) he failed to seek further information from Harry Marsh, the plaintiff's treating therapist (Pl.'s Mem at 20-21); (2) he erred in assigning "great weight" to the opinions of the non-examining doctors (Pl.'s Mem. at 21-22); and (3) he erred in failing to address Dr. Cudrin's opinion. (Pl.'s Mem. at 22-23; *see also* Pl.'s Reply at 1-4). According to the plaintiff, the ALJ also erred in his credibility determination of the plaintiff (Pl.'s Mem. at 24-25; *see* Pl.'s Reply 6-7) and in his failure to include the plaintiff's non-exertional limitations in his RFC finding. (Pl.'s Mem. at 26-27; *see* Pl.'s Reply at 7).

In response, the defendant argues that the ALJ properly considered the plaintiff's migraine headaches (Def.'s Mem. at 6-7); the ALJ properly assessed the medical opinion evidence (Def.'s

Mem. at 7-11); the ALJ properly assessed the plaintiff's subjective complaints (Def.'s Mem. at 12-13); and the ALJ's RFC was supported by substantial evidence (Def.'s Mem. at 13-14).

C.    LISTING 11.03 – MIGRAINES

The regulations provide that, if a claimant has an impairment that is not described in the Listing of Impairments in Appendix 1 of Subpart P of Part 404, the Commissioner will compare a claimant's findings with those of "closely analogous listed impairments." 20 C.F.R. § 416.926(b)(2). Migraines are assessed as "at least as medically severe" as Listing § 11.03 Epilepsy-non-convulsive epilepsy. Listing § 11.03 reads as follows:

> Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness of loss of consciousness and transient postical manifestations of unconventional behavior or significant interference with activity during the day.

In order for a claimant to show that her impairment meets a listing, the impairment must meet "all of the specified medical criteria" of that listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

In his decision, the ALJ detailed the plaintiff's treatment for migraines as follows:

> During her first neuropsychological examination with Dr. [Martin] Oliviera in 2012, the plaintiff reported that she said she had a headache that increased with cognitive exertion. She was able to tolerate 60 minutes of testing and appeared distracted by her pain. However, her IQ was average and she was generally cooperative. She complained of a headache in September 2012, but she was not given medication for her pain. By March 2013, her primary care provider, Elizabeth Appel, M.D., noted that the claimant seemed to be doing fairly well. During her consultative examination with Dr. Dodenhoff in October 2013, she complained of migraines three to four times a week despite taking Reglan and Neurontin. However, after that evaluation the record does not contain any treatment for headaches until January 2015, when the claimant reported consistently needing to stay in bed for up to three days a week because of her migraines. Dr. Appel also noted in January 2015 that the claimant had debilitating headaches since 2011, despite the moderate (at worst) complaints found in her own treatment records. The claimant went through her second examination with Dr.

9

> Oliveira in June 2015, where she had identical complaints as she did three years prior, including increased headache pain with cognitive exertion. A few months later Dr. Appel offered the claimant Amitriptyline to try to control her symptoms, but the claimant did not want to take the medication. Dr. Appel noted the claimant had updated, normal imaging of her brain.

(Tr. 29)(internal citations omitted).

The defendant argues that the ALJ did not err in his analysis, and the plaintiff cannot establish disability by "simply cit[ing] to her own subjective reports of symptoms[.]" (Def.'s Brief at 7). But there was far more evidence in the record regarding the plaintiff's suffering from migraines than her own "subjective reports." The ALJ's recitation of treatment merely scratches the surface. The underlying medical records support the plaintiff's report of symptoms.

As explained in the Commissioner's Q&A 09-036, which is "yet another guidance document maintained by the Commissioner in addition to the Regulations, Rulings, and POMS," *Merritt v. Comm'r of Soc. Sec.*, No. 15 CV 6633(CJS), 2016 WL 6246436, at *6 (W.D.N.Y. Oct. 26, 2016), the diagnosis of a migraine headache is "usually established through the patients' reported symptoms (pain, photophobia, nausea)[,]" as well as "a detailed description from a physician of a typical headache event . . . that includes a description of all associated phenomena[.]" (Pl's Mem, Ex. Q&A 09-036); *see Merritt*, 2016 WL 6246436, at *6. As Q&A 09-036 explains: "[t]here are other clinically accepted indicators of the diagnosis, including[,]" a headache lasting from 4 to 72 hours if untreated with two of the following: "[u]nilateral, pulsating (throbbing) quality; moderate . . . or severe . . . pain intensity, worsened by routine physical activity (or causing avoidance of activity)"; and, at least one of the following during the headache: nausea, vomiting, photophobia, or phonophobia. (Pl.'s Mem., Ex. Q&A 09-036). In addition to the foregoing, the requirement under Listing § 11.03 for the occurrence "more frequently than once weekly in spite of at least 3 months of prescribed treatment[]" is "[i]napplicable" as it relates to

migraines, and "it is not necessary for a person with migraine headaches to have alteration of awareness as long as s/he has an effect . . . that significantly interferes with activity during the day." (Pl.'s Mem., Ex. Q&A 09-036). Significant interference with activity during the day includes the "need for a darkened, quiet room, lying down without moving, or a sleep disturbance that impacts on daytime activities." (Pl.'s Mem., Ex. Q&A 09-036).

While this record is notable for a limited number of treatment records within the relevant time period, [6] the record does reflect observations by physicians as to the plaintiff's migraines, including the plaintiff's long-standing treating physician, two neurologists, and a neuropsychologist,[7] as well as a history of light sensitivity, and consistent reports of the impact her migraines have had on her daily activities over a lengthy period of time. For example, Dr. Martin Oliveira, a clinical neuropsychologist who performed consultative examinations of the plaintiff in 2012 and 2015 (Tr. 1044, 1046-50, 1168-73), noted that the plaintiff's episodes of migraines "at times, involved nausea, occasional vomiting, photophobia, and phonophobia." (Tr.

---

[6] As stated above, the plaintiff's alleged onset date of disability is October 25, 2011, and her date last insured in September 30, 2014. Accordingly, although the Court has reviewed the entire transcript, including the many medical records pre-dating the plaintiff's alleged onset date of disability, as well as plaintiff's long history for treatment of migraines and back pain (*see generally* Tr. 476-1009), the Court will address the medical records only as they relate to the plaintiff's alleged period of disability.

[7] The plaintiff has been treated by her mental health therapist, Harry Marsh, MSW, since 2011; however, there are very few records in the administrative transcript. (Tr. 1179). On January 16, 2015, Marsh reported that he had been seeing the plaintiff three times a week for four years and that her severe migraines and back pain have had a "profound impact on her life functioning." (Tr. 1179). In his view, the plaintiff's "immediate memory is severely compromised, as well as her inability to clearly recall events from her past[,]" and her condition "would definitely severely limit her ability to gain or keep gainful employment." (Tr. 1180). At the hearing, the ALJ denied the plaintiff's counsel's request that Marsh be permitted to testify and instead instructed counsel to have the therapist explain the discrepancies in his diagnoses in a letter. (Tr. 74-81). Accordingly, in a January 20, 2016 letter, Marsh noted that he schedules the plaintiff for many sessions because she often has to cancel. (Tr. 1184). He also noted that their meetings are sometimes on SKYPE, when she is in too much pain to drive to his office. (Tr. 1184). According to Marsh, the plaintiff appears to be in constant pain, although the intensity varies, such that "[w]hen the pain is intense, [the plaintiff] has tremendous difficulty staying on track of anything we are talking about. She will stop talking in the middle of the sentence because she has forgotten the subject. When this occurs she is visibly frustrated and can get extremely angry at herself." (Tr. 1185). Marsh stated that, in general, the plaintiff "has virtually no immediate memory[,]" and she "could [not] obtain or keep any type of employment." (Tr. 1185).

1046). Similarly, Dr. Bushra Khan, a neurologist who examined the plaintiff on September 9, 2015, noted that the plaintiff's pain "shoots up from both sides of her neck radiating both temporal regions, it is sharp and burning with phonophobia and photophobia." (Tr. 1160).

Although the plaintiff wore sunglasses to her hearing to address her photophobia, the ALJ erroneously stated that "there is no indication anywhere else in the record that she had to do this at any of her other several examinations." (Tr. 30). To the contrary, Dr. Oliveira noted that, during his 2012 evaluation, the plaintiff "required use of sunglasses at one point due to increased sensitivity to light and her worsening headache pain." (Tr. 1171).[8] Additionally, the record reflects several reports that, due to her migraine headaches, the plaintiff had to lie in a dark room several times a week. (Tr. 1033, 1146, 1172).

Moreover, there are considerable records reflecting the impact of the plaintiff's migraine pain on her functional ability. During his 2012 evaluation of the plaintiff, Dr. Oliveira observed that the plaintiff "appeared distracted by pain[]" while he conducted his neuropsychological examination, such that he opined that her "chronic headache pain (particularly when exacerbated by activity and cognitive exertion) would be expected to substantially impair [the plaintiff's]

---

[8] Dr. Oliveira noted that the plaintiff's migraines started after a motor vehicle accident in 1992 and exacerbated following a second accident in 2004, from which she also developed leg and back pain. (Tr. 1169). Dr. Oliveira concluded that the "level and severity of noted difficulties, involving headache pain (particularly when exacerbated by activity and cognitive exertion) would be expected to substantially impair [her] capacity to carry out duties of employment." (Tr. 1168). At the time of the 2012 evaluation, in addition to constant headache with migraines several times a week, the plaintiff suffered from back pain, allergies, asthma, and "significant emotional distress" with "related irritability/agitation." (Tr. 1170). He opined that, "[b]ased on her previous experience, she has been able to tolerate a single four hour workday if she neglects her functional threshold, but this has consistently resulted in debilitating consequences and harm to her health and well-being." (Tr. 1172). Additionally, Dr. Oliveira noted that "social functioning is also significantly impacted by the patient's chronic pain, as her typical day is often limited and spent within her home, where she is able to manage her environment accordingly (i.e. dimmed lights or altered position....)" (Tr. 1172). The plaintiff was re-evaluated by Dr. Oliveira on June 11, 2015; his findings were "generally consistent" with his 2012 findings, although the plaintiff noted "a greater level of distress relative to her previous emotional state in 2012, and endorsed a 'severe' level of depression, likely exacerbated by her chronic pain." (Tr. 1043-50). Dr. Oliveira reiterated that the "level and severity of noted difficulties, involving intolerable/debilitating headache pain (particularly when exacerbated by activity and cognitive exertion) would be expected to substantially impair [her] capacity to carry out duties of employment." (Tr. 1050).

ability to carry out duties of employment." (Tr. 1168; *see also* Tr. 1048-49, 1170-71 ("Behavioral Observations: . . . persistent underlying headache . . . , which appeared to distract her from the state of the assessment."); *see* Tr. 1049-50, 1171-71). Dr. Oliveira noted that the plaintiff reported underlying headaches at all times, with migraines several times a week. (Tr. 1170; *see also* Tr. 1033 (report to Dr. Robert Dodenhoff, who conducted a consultative examination on October 8, 2013, that the plaintiff experienced three to four migraines a week), Tr. 1146 (report to Dr. Appel on January 2, 2015, that migraines caused the plaintiff to be "consistently in bed 2-3 days a week with headaches . . .")). Additionally, on December 21, 2015, Dr. Brian Grosberg, a neurologist and the Medical Director of the Hartford HealthCare Headache Center, noted that, during exacerbations of her migraines, the plaintiff would have problems speaking, would use the wrong words, and would have difficulty with word-finding. (Tr. 1193; *see* Tr. 1188-95). This assessment is consistent with what Dr. Oliveira witnessed during his 2012 neuropsychological evaluation of the plaintiff, at which time he noted that the plaintiff "was only able to tolerate 60 minutes of neurocognitive testing" and developed slurring of her words and word finding difficulties "upon the development of ostensible fatigue." (Tr. 1171). Dr. Oliveira opined that the plaintiff did appear to put forth "her best effort" despite her difficulties and that her symptoms are "considered chronic and unremitting." (Tr. 1172). Similarly, in 2015, he noted that her "underlying headache pain reportedly increased with cognitive exertion (Tr. 1049) and was exacerbated by activity as well. (Tr. 1050).

Additionally, contrary to the ALJ's finding, the record does not reflect the plaintiff's failure to be prescribed medication or to take medication. (*See* Tr. 29 (ALJ recitation that the plaintiff "complained of a headache in September 2012, but she was not given medication for her pain[]" and that in 2015 Dr. Appel "offered the claimant Amitriptyline to try to control her symptoms, but

the claimant did not want to take the medication.")). Rather, the plaintiff consistently took medications for migraines. Moreover, some pain medications offered and prescribed for her other impairments increased her headache pain. At the September 2012 visit with Dr. Appel for her chronic back pain,[9] which the ALJ references in his decision, it is noted that the plaintiff was taking Amerge, which she had been prescribed for her migraines, and that she had "[S]oma refilled since it is the only muscle relaxer that works and doesn't flare her headaches[.]" (Tr. 1119-20). The plaintiff "refuse[d] pain meds" for her back pain (Tr. 1120), and when she saw Dr. Appel again on March 11, 2013, she again "declined any narcotic medication because they intensify her migraine headaches." (Tr. 1125).[10] At that visit, however, Dr. Appel noted that the plaintiff "seem[ed] to be doing fairly well" as to her migraines (Tr. 1125), and, as the ALJ correctly noted, the record does not show treatment specifically for migraines over the next year. The record, however, does reveal that the plaintiff continued to take prescription medications for her migraine pain. (*See* Tr. 1136, 1141 (On December 9, 2013 and May 9, 2014, Dr. Appel notes migraines on chronic problems list); *see also* Tr. 1033 (On October 8, 2013, Dr. Dodehoff conducted a consultative exam and noted that the plaintiff was taking, among other medications, Neurontin, Meloxicam, Soma, and Amerge); Tr. 1152-55 (prescribing Replax to the plaintiff for migraines)). Additionally, the records reflect that the plaintiff "tried" several medications to "treat her headaches but none of these medications have worked for her." (Tr. 1160 (reciting the following medications: Imitrex,

---

[9] At this visit, the plaintiff reported to Dr. Appel that her migraines were out of control and that she had been to emergency room three times in the prior four to five months. (Tr. 1118; *see* Tr. 1120 (at this visit, the plaintiff was taking, among other medications, Amerge, Difucan, Meloxicam, Gabapentin, and Soma)). The ALJ is correct that "although [the plaintiff] complained about [her headaches] several times [and] indicated she has been to the emergency room many times for migraines, [that] claim that is not substantiated by the record." (Tr. 30). The record, however, as discussed above, includes consistent treatment for the plaintiff's migraine headaches. (*See* Tr. 1135, 1141, 1146-47, 1160, 1193).

[10] The plaintiff reported that she had tried to get treatment at Beth Israel for her headaches, but was unable to do so. (Tr. 1122).

14

caffeine pills, Depakote, Verapamil, Zomeg, and Zoloft, and noting that the plaintiff "cannot try [T]opomax because she is allergic to sulfa drugs"); *see also* Tr. 1165 (noting that the plaintiff "has failed most of migraine medications in the past including botulinum toxin treatment[.]"); *see* Tr. 1169).

In concluding that the plaintiff's migraines did not meet listing level severity, the ALJ failed to consider medical evidence in the record, including the "other clinically accepted indicators of the diagnoses" and the plaintiff's "reported symptoms (pain, photophobia, nausea)[,]" as well as the "detailed description[s] in the record from [the] physician[s] of [her] typical headache event[,]" including the descriptions in the record of the "associated phenomena[,]" as detailed in Q&A 09-036. (Pl's Mem, Ex. Q&A 09-036); *see Merritt*, 2016 WL 6246436, at *6. A remand is necessary so that the ALJ can consider all of the evidence in the record to determine whether the plaintiff's migraine headaches meet a listing, following the specific guidance in Q&A 09-036 as to how to apply Listing § 11.03 to migraines. Though "migraine headaches will rarely prevent a person from working for a continuous 12 months," (Pl.'s Mem., Ex. Q&A 09-036), an ALJ must still go through the process of analyzing all of the evidence in the record to determine if the condition meets a listing. Thus, while this Court is not deciding whether the plaintiff has established that her migraines meet listing level severity, it is clear that the ALJ did not consider the foregoing signs and symptoms in his evaluation of the plaintiff's migraine headaches and must do so on remand.

D. <u>ASSESSMENT OF MEDICAL OPINION EVIDENCE AND RFC DETERMINATION</u>

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue,* 537 F.3d 117, 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). "[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight." Social Security Ruling 06–3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 6, 2006). "Acceptable medical sources" are further defined (by regulation) as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

The ALJ assigned "great weight" to the opinions of the state agency psychiatric consultants, Drs. John Gambill and Janine Swanson. (Tr. 31). On November 26, 2013, Dr. Gambill completed a Mental Residual Functional Capacity Assessment of the plaintiff in which he found the plaintiff moderately limited in her ability to complete a normal workday; moderately limited in her ability to respond appropriately to changes in the work setting such that her symptoms "increase with stress and pain"; and moderately limited in her ability to understand and remember detailed instructions due to "some memory and issues of [learning disorder] per prior file, which also noted she completed 1 year of college in 2008." (Tr. 160-61).

In a Psychiatric Review Technique completed by Dr. Swanson on June 24, 2014, she found that the plaintiff would have moderate difficulties in maintaining concentration, persistence or pace. (Tr. 169). In her Mental Residual Functional Capacity Assessment, Dr. Swanson opined that the plaintiff is moderately limited in her ability to complete a normal workday and workweek in that she is

> able to attend to simple to moderately complex tasks for at least two hours at a time, but secondary to affective symptoms would not be able to sustain concentration on complex tasks for more than a very brief period. [Claimant] is also likely to demonstrate some cognitive slowing indicative of depression, which would make it difficult for [claimant] to perform adequately in a fast paced, competitive environment. Thus, secondary to reduced concentration and pace, [claimant] will be able to perform simple, routing, repetitive tasks in a setting that does not require strict adherence to time or production quotas.

(Tr. 171). Based on these two opinions, the ALJ concluded that the plaintiff retains the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), "except she is capable of simple, routine, and repetitive tasks, but not at a production-rate pace[.]"

The Second Circuit has recognized that "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source[,]" *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993), but may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)). In this case, however, as discussed in Section IV.C. *supra*, the ALJ did not properly consider all of the medical evidence.

In addition to the State agency assessments, the ALJ had the benefit of the opinions of two neurologists, neuropsychological evaluations performed in 2012 and 2015 by Dr. Oliveira, the opinion of Dr. Jay Cudrin, a psychologist who performed a consultative evaluation,[11] the plaintiff's

---

[11] The ALJ's decision completely omitted a discussion of the weight he assigned to Dr. Cudrin's opinion.

17

treatment records, and the opinion of her long-standing treating physician, Dr. Appel.[12] (Tr. 1118 (treating the plaintiff since 2000)). The neurologists, neuropsychologist, and Dr. Appel also assessed the plaintiff as having reduced concentration, but found much greater limitations on her functional and cognitive abilities due to her migraine headaches. Specifically, as discussed above, Dr. Grosberg noted that, during exacerbations of her migraines, the plaintiff would have problems speaking, would use the wrong words, and would have difficulty with word-finding. (Tr. 1193; *see* Tr. 1188-95). Similarly, during his 2012 neuropsychological evaluation of the plaintiff, Dr. Oliveira observed that the plaintiff "was only able to tolerate 60 minutes of neurocognitive testing" and developed slurring of her words and word finding difficulties "upon the development of ostensible fatigue." (Tr. 1171). Similarly, in 2015, he noted that her "underlying headache pain reportedly increased with cognitive exertion (Tr. 1049) and was exacerbated by activity as well. (Tr. 1050).

Proper consideration of the plaintiff's migraine headaches on remand involves a consideration of the medical opinions in the record, including a consideration of the consistency among these opinions. The evaluation of these providers' opinions is tied to the assessment of the plaintiff's migraine headaches, as each of these providers discuss the impact that this severe impairment had on the plaintiff's ability to function. In light of the conclusion reached in Section IV.C. *supra*, on remand, the ALJ shall reweigh the medical opinions in the record after consideration of the plaintiff's migraines. In particular, the ALJ should apply the treating physician rule and give appropriate weight to the medical evidence in the record.[13]

---

[12] Dr. Appel relied on Dr. Oliveira's neuropsychological evaluations of the plaintiff when she completed her Physical Residual Function Capacity Medical Source Statement on January 4, 2015, concluding that the plaintiff was unable to complete full work days five or more days a week, was unable to stay on task for more than ten percent of the time, and was likely to be absent from work more than five days in a work week. (Tr. 1177).

[13] In light of the conclusion reached in Section IV.C. *supra*, the Court need not address the plaintiff's credibility argument. On remand, the ALJ must weigh the medical evidence related to the plaintiff's migraines, consider her signs

V.   CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 21) is *granted such that the matter is remanded for further proceedings consistent with this Ruling*, and the defendant's Motion to Affirm (Doc. No. 23) is *denied*.

Dated this 21st day of September, 2018 at New Haven, Connecticut.

   /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge

---

and symptoms as to this condition, and determine, based on all of the evidence in the record, whether the migraines meet listing level severity and their impact, singly and in combination with her other severe impairments, on her ability to function.